Ashley A. Harada
Harada Law Firm, PLLC
2772 3rd Avenue North, Suite 400
P.O. Box 445
Billings, MT  59103
(406) 294-2424
(406) 272-0037 (Fax)

ashley@haradalawfirm.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BILLINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 16-42-BLG-SPW |
| | ) | |
| Plaintiff, | ) | BRIEF IN SUPPORT OF |
| | ) | MOTION TO SUPPRESS |
| vs. | ) | |
| | ) | |
| JOSHUA JAMES COOLEY | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

COMES NOW Defendant, JOSHUA JAMES COOLEY, by and through his counsel of record, ASHLEY A. HARADA, and hereby files the following Brief in Support of Defendant's separately filed Motion to Suppress.

## STATEMENT OF THE FACTS

On February 26, 2016, at approximately 1 a.m. in the morning, Crow Indian Reservation Highway Safety Officer James D. Saylor was eastbound on Highway

1

212 when he saw a vehicle legally parked on the westbound shoulder of the highway.[1] USAO – 012. The vehicle he saw was a 2007 white Dodge Ram pickup with Wyoming license plates. Officer Saylor decided to do a "welfare check" on the occupants of the Dodge, so he turned around and approached the vehicle from behind. Officer Saylor activated the emergency lighting in the rear of his police unit to warn oncoming westbound traffic but did not activate his front emergency lighting equipment as he "did not want the occupants of the Dodge to feel as though I was detaining them or 'pulling them over.'" USAO – 012.

There is a video of the stop, but the copy of the video given to the defense does not start until after a large portion of the stop had already taken place. The same is true of any audio recording of conversations that took place between Officer Saylor and Cooley. Despite having no recording of this portion of the stop, Officer Saylor quotes numerous statements allegedly made by Cooley in his report, *using quotations marks*. See e.g., USAO – 013, 014. Officer Saylor gives no explanation as to how he can quote Cooley's statements if he has no recording of this portion of the stop. The events and conversation that took place between Officer Saylor and Cooley before the start of the video and/or audio are in dispute.

---

[1] The facts here come from a report authored by Officer Saylor and are cited for purposes of this motion, only. Cooley does not stipulate to the truth of the facts in Officer Saylor's report.

According to Officer Saylor's report, after pulling in behind the pickup, Officer Saylor got out of his car and approached the truck. He said that he could not see inside the pickup very well as the windows were tinted. He said he could tell the pickup's engine was running and he saw tools and other items in the open bed of the truck. Officer Saylor also said he thought he saw movement between the rear and front seat of the pickup, but he was unsure as "visibility was poor."

After approaching the pickup, Officer Saylor knocked on the pickup to ask if everything was ok. According to Officer Saylor, the rear passenger window of the truck then rolled down slightly. Officer Saylor shined his flashlight into the front driver compartment where he could see the figure of a man in the driver's seat. Officer Saylor could also see a small child that was attempting to climb into the front seat from the back seat. According to Officer Saylor, when he made contact with the man, the man raised his right hand as he was looking out the window towards him and then motioned his thumb downward in a "thumbs down" type of fashion. Officer Saylor said he did not know what this gesture meant, but he "surmised that thing (*sic*) were not well."

Officer Saylor asked the driver, later identified as Joshua Cooley, to roll down the driver's side window so he could speak with him. Cooley complied with the officer's request and partially rolled down his window. Officer Saylor asked Cooley why he was pulled over on the side of the road, and Cooley told Officer

3

Saylor he had pulled over because he had gotten tired from his drive. According to his report, Officer Saylor said Cooley assured him he had only pulled over because he was tired.

Officer Saylor, who said he was only checking on the welfare of the occupants of this truck, did not end his encounter with Cooley. Instead, he continued to question Cooley, asking him where he had come from and where he was he going. Officer Saylor said he often observed vehicles in the area with Wyoming license plates; however, "most usually the drivers of the vehicles appeared to be Native American and were from other Indian Reservations." According to Officer Saylor, Cooley did not appear to be "Native."

Officer Saylor said Cooley told him he had been in Lame Deer. Cooley told Officer Saylor he had come up from Wyoming to purchase a vehicle. Rather than taking Cooley's word, Officer Saylor continued to question him, asking him for more details about who he was buying a vehicle from. Cooley attempted to answer Officer Saylor's questions, but according to Officer Saylor, his responses "did not make any sense." USAO – 013.

Although Officer Saylor had clearly determined Cooley was not in need of any assistance, Officer Saylor did not end the encounter or allow Cooley to leave, but instead continued to question him. Again, there is no video or audio recording of this portion of the interaction between Officer Saylor and Cooley.

As he continued to question Cooley, Officer Saylor repeatedly told Cooley that what Cooley was saying did not make any sense. Officer Saylor states in his report that Cooley then became agitated and said "I don't know how it doesn't seem to make any sense, I told you I cam (*sic*) up to buy a vehicle." USAO – 014.

Cooley continued to become agitated as Officer Saylor "continued to probe [him] for a response. . ." At the same time, Officer Saylor claims Cooley began speaking "in a lower volume making it difficult for me to hear him. . . ." USAO – 014. Officer Saylor told Cooley to roll down his window further. Cooley complied and according to his report, it was after Officer Saylor's second request to roll down the window that he said he could see two rifles against the front passenger seat. USAO – 014.

Officer Saylor asked Cooley to provide identification. Cooley attempted to comply with the officer's request while holding his child. While he was doing so, Officer Saylor "removed [his] service pistol from its holster and held it to [his] side." USAO – 014. In one instance, Officer Saylor ordered Cooley to "stop, show me your hands, do it now." In his report, Officer Saylor states Cooley seemed startled by his "sudden command. . . ." Officer Saylor told Cooley that he was no longer "allowed to move his hand without my permission." USAO – 014.

Officer Saylor notes in his report that he decided to "re-position myself to the passenger side of the vehicle." USAO – 015. He said "moved quickly to the

passenger side of the truck and opened the front passenger door to continue speaking with [Cooley]." Officer Saylor did not ask Cooley's permission to open the passenger door.

After opening the passenger door, Officer Saylor continued to question Cooley. It is sometime after Officer Saylor opened the passenger door, that the video portion (but not the audio portion) of the defense copy of the DVD starts working. In his report, Officer Saylor said that he could tell the rifles he saw "did not appear to be loaded." But now that he had opened the pickup door, he said he could also see "the handle of a pistol tucked under the center folding seat . . . ." Officer Saylor said he "reached in and quickly removed the pistol. . . ." Officer Saylor continued to question Cooley, eventually ordering him out of the pickup.

Cooley complied with Officer Saylor's order and can be seen on the video walking toward the police car holding his child in his arms. At the car, both Cooley and Saylor disappear from the view of the camera for a few seconds until Cooley is then seen stepping backward into view. At this point, Cooley is holding his right arm in the air (and to the extent possible while holding his child) his left arm as well.

Officer Saylor is then observed tapping and pointing with his finger to the hood of his car. (01:41). In response, Cooley starts removing the contents of his pocket with his right hand and placing them on the hood of the police vehicle. At

02:00, the audio portion of the tape suddenly starts playing. At 02:04, Officer Saylor is heard saying: "Keep doing what you want to do. If you want your money right there that is fine." Officer Saylor's comments are inconsistent with the gesture he made before Cooley started emptying his pockets. Cooley can be heard protesting his detainment, telling Officer Saylor there is nothing; he does not understand; he is a mechanic that buys cars; he pulled over because he was tired.

In Officer Saylor's report, he describes the above interaction as follows:

> *As I began to escort him and his child to my unit* [Cooley] *paused <u>and asked if he could remove the money from his pocket</u>*. I told [Cooley] to stand in front of my unit and advised him he could removed (sic) anything he wanted to from his pockets.

USAO 015 (emphasis and double emphasis added.)

Later on the video, Officer Saylor can be heard telling Cooley to "hold up." At this point Officer Saylor is seen reaching deep inside the front pocket of Cooley's hoody and pulling out a piece of plastic. (02:34). Officer Saylor asks Cooley what the item was and Cooley responds he does not know, that it is a piece of plastic. Officer Saylor disagrees with Cooley and tells him that it is "a dope baggie." (02:47). Officer Saylor tells Cooley to have a seat in his vehicle. Cooley objects and tells Officer Saylor that he does "not have permission to do this to us." Officer Saylor responds: "I don't need your permission." (03:31). Officer Saylor tells Cooley: "Until I am convinced everything is on the up and up, you are not going anywhere." (03:59).

7

While Cooley was detained in the back seat of the police car, Officer Saylor calls his dispatch to send another vehicle. He asks dispatch to run Cooley's driver's license number for warrants. He tells dispatch he is going to run the numbers on three firearms. Finally, he tells dispatch to "send someone from County" to the scene.

At 08:09 of the video, Deputy Saylor walks up to the passenger side of the pickup. Beginning at 08:40, the silhouette of his body can briefly be seen inside the cab of the pickup. Deputy Saylor then brings the rifles to the hood of his car. Shortly thereafter, another officer arrives on scene. Deputy Saylor tells the officer that "we got about a pound of meth and three guns." (09:11).

In his report, Deputy Saylor said that he decided "to seize all weapons, suspected controlled substances, money, drug paraphernalia, ammunition, and electronics such as cell phones and communication devices which were in plain view." USAO 016. When removing the items from the Dodge, Deputy Saylor said he located what appeared to be an "Iphone" case beneath the front driver seat. Deputy Saylor said he was going to take the phone out of the box, but when he opened it, he discovered no phone. Instead, according to Deputy Saylor, the box was full of a white powdery, crystalline substance. USAO 017.

Officer Saylor transported Cooley and his child to the Crow Police Department for questioning. Officer Saylor states in his report that when

investigators met with Cooley, Cooley "chos[e] to sign written consent to search the remainder of the Dodge for additional evidence . . . ." USAO 017.

Later, it was learned that Cooley's driver's license was suspended. Cooley was subsequently arrested by Deputy Gibbons of the Bighorn County Sheriff's Department and transported to the Bighorn County Jail for booking." USAO 017.

Cooley was indicted for the offense of Possession with Intent to Distribute Methamphetamine and Possession of a Firearm in Furtherance of a Drug Trafficking Offense. The offenses are said to have taken place within the exterior boundaries of the Crow Indian Reservation. Cooley has entered a not guilty plea to all counts and the case is currently set for trial.

## STATEMENT OF THE LAW AND ARGUMENT

### I. Officer Saylor, who was a Tribal Officer, Did Not Have Authority to Conduct an Investigation of a Non-Tribal Member.

Preliminarily, the facts of this case call into question the authority of Officer Saylor, who is identified as a tribal officer, to conduct a criminal investigation of a non-Indian on the reservation. The United States Supreme Court has limited the authority that tribes may exercise over non-Indians. See e.g., *Montana v. United States*, 450 U.S. 544, 565 (1981). In *Montana*, the Court held that the Crow Tribe could not prohibit on reservation fishing and hunting by non-Indians. The Court endorsed the "general proposition that the inherent sovereign powers of an Indian

9

tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565.

One power found to be intrinsic to tribal sovereignty is the power to exclude trespassers from the reservation, a power that necessarily entails investigating potential trespassers. *United States v. Becerra Garcia*, 397 F.3d 1167, 1175 (9th Cir. 2005). The limit of that tribal authority, however, was recognized in *Bressi v. Ford*, 575 F.3d 891 (9th Cir. 2009). As noted in *Ford*:

> We conclude that a roadblock on a public right of way within tribal territory, established on tribal authority, is permissible only to the extent that the suspicionless stop of non-Indians is limited to the amount of time, and the nature of inquiry, that can establish whether or not they are Indians. When obvious violations, such as alcohol impairment, are found, detention on tribal authority for delivery to state officers is authorized. But inquiry going beyond Indian or non-Indian status, or including searches for evidence of crime, are not authorized on purely tribal authority in the case of non-Indians.

*Ford*, 575 F.3d at 896-97 (emphasis added.)

A tribe's proper response to a crime committed by a non-Indian on the reservation is limited to detaining the offender and delivering him or her to the proper authorities. *State v. Schmuck*, 850 P.2d 1332, 1340 (Wa. 1993); citing to *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975). Inquiry going beyond Indian or non-Indian status, or including searches for evidence of crime, are not authorized in the case of non-Indians. *Ford*, 575 F.3d at 896-97.

The Fourth Amendment typically does not directly govern the conduct of tribal officials in Indian country. *United States v. Becerra Garcia*, 397 F.3d 1167, 1171 (9th Cir. 2005). However, tribal power to investigate violations in Indian country is constrained by the limits contained in the Indian Civil Rights Act (ICRA). The ICRA imposes an identical limitation on tribal government conduct as the Fourth Amendment. The Indian Civil Rights Act has been extended to protect the rights of non-Indians while on tribal lands from unreasonable searches and seizures by tribal government. *United States v. Keys*, 390 F.Supp.2d 875, 884 (D.N.D. 2005) (statements made by non-Indian defendant illegally detained and questioned by Bureau of Indian Affairs officer on reservation after non-Indian status verified, were obtained in violation of 25 U.S.C.§ 1302(2) and were suppressed).

Here, Officer Saylor is identified in his report as a "Highway Safety Officer for the Crow Indian Reservation."[2] His police report comes from the "Crow Police Department." According to his report, the actions Officer Saylor took in this case were "as part of a function of my position as a Highway Safety Officer for the Crow Indian Reservation." USAO - 012. He stated his position required him to look out for the travelers on the highway.

---

[2] Officer Saylor is not identified as a BIA officer. Defendant recognizes that the authority of BIA officers is set forth in 25 U.S.C. § 2803, and includes authority to conduct a traffic stop.

Officer Saylor's actions in this case went far beyond providing possible assistance to a motorist and far beyond "detention on tribal authority for delivery to state officers…." See e.g., *Ford*, 575 F.3d at 896-97. As can be seen on the video provided by the Government, Officer Saylor conducted a full-blown criminal investigation, resulting in the illegal detention of Cooley, followed by a warrantless search and seizure of his vehicle.

Officer Saylor did not have a warrant, either to arrest Cooley, or to search his car. Importantly, Officer Saylor was not requested to provide assistance by state law enforcement. His actions went far beyond those authorized for a tribal officer. All evidence obtained by Officer Saylor must be suppressed.

**II. After Officer Saylor Determined Cooley Was Not in Need of Assistance, any Continued Detention Beyond That Point Was Illegal.**

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968); citing to *Union Pacific Railroad Company v. Botsford*, 141 U.S. 250, 251 (1891).

There are a number of potential types of contacts between law enforcement officers and the public which implicate the Fourth Amendment. Arrest is the most intrusive and is only reasonable if supported by probable cause. *United States v.*

*Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). The next level of contact is that of the investigatory detention which may result from a reasonable suspicion the detained individual is engaged in criminal activity. *Terry*, 392 U.S. at 88. Additionally, an officer may conduct a brief, non-investigative detention while exercising their community caretaking function, regardless of suspected criminal activity. *Cady v. Dombrowski*, 413 U.S. 433, 441(1973). Notably, community caretaking functions must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *United States v. King,* 990 F.2d 1552, 1560 (10th Cir. 1993) (quoting *Cady*, 413 U.S. at 441). An initially consensual encounter between a police officer and a citizen can be transformed into a seizure if, in view of all the circumstances surrounding the incident, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In the present case, the facts show that Officer Saylor illegally seized Cooley. Although initially, Officer Saylor may have been acting pursuant to a community caretaking function, it was clear minutes after the initial encounter, Cooley was not in need of assistance.

Nor was the encounter consensual. Although Cooley may have originally responded to Officer Saylor's questions, it became abundantly clear that Cooley wanted the encounter to end.

The encounter did not end. Instead, according to Officer Saylor's own report, he continued to "probe" Cooley for information. At one point, Officer Saylor even took his weapon out of its holster and held it to his side. No reasonable person in Cooley's position would have felt free to leave.

Cooley was seized from the time Officer Saylor began questioning him at the driver's door of the pickup. The question then becomes whether the seizure was reasonable. In *Terry*, 392 U.S. at 19-20, the Supreme Court enunciated the dual inquiry in determining whether a seizure is unreasonable under the Fourth Amendment: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. To justify seizing a suspect, the officer must be able to point to specific and articulable facts which reasonably warrant the intrusion. Further, the scope of the interference must not be more intrusive than is necessary to accomplish the purpose for which the stop is authorized. *Terry*, 392 U.S. at 19.

In the present case, Officer Saylor had no legitimate reason to seize Cooley. Even if Officer Saylor originally contacted Cooley in his community caretaking role, the legitimacy of that contact ended once he knew Cooley did not need assistance. Nothing about Cooley was suspicious. Certainly, Officer Saylor did not have a reasonable suspicion that Cooley had committed any traffic offenses or a crime.

The Supreme Court has said that in the absence of a basis for suspecting a person of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. *Brown v. Texas*, 443 U.S. 47, 50-52 (1979). In *Brown*, police observed Brown and another man walking away from one another in an alley in an area which had a high incidence of drug trafficking. When the police stopped Brown, he refused to identify himself to the police and was convicted of violating a Texas statute which made it a crime to refuse to identify one's self to the police. The Supreme Court held that Brown could not be required to identify himself to the police because the police did not have a reasonable suspicion he was involved in criminal conduct. *Id.*

Here, like in *Brown*, there was no reason to justify Officer Saylor's interference with Cooley's right to personal security and privacy. Cooley was not suspected of any criminal activity or of even committing a traffic violation. Once Office Saylor ascertained that Cooley was not in need of assistance, the legitimate purpose for his community caretaker contact with Cooley disappeared. Officer Saylor's subsequent seizure of Cooley was an illegal investigatory stop because it was made without reasonable and articulable suspicion that Cooley had committed a crime or traffic violation, as required by *Terry*.

Officer Saylor may try to argue his contact with Cooley was consensual. Even if that were true at the beginning of his contact with Cooley, it is clear the

contact became nonconsensual within minutes. Recall Officer Saylor's observation that Cooley was becoming "agitated" as he continued to "probe" him for information. Contact after this point was nonconsensual and required particularized suspicion of criminal wrongdoing in order to be constitutional.

Cooley was told to roll down his window, twice. He did not do so voluntarily. See e.g., *Adams v. Williams*, 407 U.S. 143, 145, n. 1 (1972) (parties were in agreement that defendant did not act voluntarily in rolling down the window of his car.) The Government bears "the heavy burden of demonstrating that the consent [to search] was freely and voluntarily given." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1327 (1997). The fact that Officer Saylor withdrew his gun from its holster leads to the conclusion any interaction with Cooley was not with his voluntary consent. See, e.g., *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995)

Officer Saylor did not have sufficient reason to detain Cooley. "An officer's "inchoate and unparticularized suspicion or 'hunch' " is insufficient to give rise to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Late discovered property cannot be relied upon to establish reasonable suspicion to justify the police intrusion upon a defendant's liberty in the first place. See *Ybarra v. Illinois*, 444 U.S. 85, 93 n. 5 (1979).

### III. All Evidence Obtained Following the Illegal Detention of Cooley Must Be Suppressed.

The exclusionary rule bars the admission of evidence seized in violation of the Fourth Amendment and evidentiary fruits of the illegal seizure. See *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963). "The essence of [an exclusionary rule] forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."

Here, the government has failed to meet its burden of justifying under the Fourth Amendment the police intrusion upon Cooley's liberty. The government has failed to show that the encounter (following the determination Cooley did not need assistance) was either consensual, or supported by reasonable, articulable suspicion of unlawful activity. All evidence recovered as a result of the illegal detention and investigation of Cooley, including the search of his car, must be suppressed.

### IV. Spoliation of the Video Evidence in This Case Requires Dismissal.

The spoliation of the video evidence in this case requires a dismissal of all charges. Spoliation, especially in a criminal case where one's very liberty is at stake, is unacceptable. See e.g., *United States v. Ungar*, 648 F.Supp. 1329, 1336 (E.D.N.Y. 1986).

In *Unger*, the district court discussed an appropriate remedy for the spoliation of video evidence. Although not binding, the court's analysis is instructive. In that case, the court was alerted that portions of a videotape had been deliberately erased by a government agency. The court said that it did not believe the investigatory agency would delete material that was beneficial to the government's case. Therefore, the court found the missing recording to be, at best, neutral and, at worst, adverse to the government's case or of an exculpatory nature for the Defendant.

In the present case, disputed portions of the video evidence of the encounter between Officer Saylor and Cooley are missing. Neither the government nor Officer Saylor has provided a reason for the missing evidence. Like in *Unger*, it can be inferred that the missing portion of the tape was at best neutral, but more likely, it was exculpatory for Cooley.

This is not the first time that Officer Saylor has claimed to not have video evidence of a disputed stop. See *United States v. Jose Isidro Orozoco-Herrera*, Montana District Court Cause No. CR 14-89-BLG-SPW . In the *Orozoco-Herrera* case, at issue was whether Officer Saylor's description of the driving pattern of a vehicle was accurate. In that case, Officer Saylor claimed to have "inadvertently" turned off his dash cam earlier in his shift. Here, Officer Saylor again failed to

18

turn on his equipment, or it mysteriously did not work during portions of the stop, which is key to Cooley's defense.

The government has the duty to preserve discoverable evidence and courts have repeatedly warned of the jeopardy in which the government places its prosecutions when it disregards this obligation. See e.g., *United States v. Henriquez*, 731 F.2d 131, 137-38 (2d Cir. 1984)). Where, as here, the destruction is at the very least suspicious, sanctions should follow.

Cooley respectfully requests this case be dismissed.

DATED this 4th day of November, 2016.

/s/ Ashley Harada
_____
Ashley Harada
Attorney for Defendant

## CERTIFICATE OF SERVICE - L.R. 5.2(b)

  I hereby certify that on November 4, 2016, a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| _1, 2_____ | CM-ECF |
| _____ | Hand Delivery |
| _____ | Fax |
| ___3_____ | Mail |
| _____ | E-Mail |

1.  CLERK, U.S. DISTRICT COURT

2.  Lori A. Harper Suek
  OFFICE OF THE U.S. ATTORNEY
  2601 Second Avenue North
  Suite 3200
  Billings, MT 59101
  Counsel for the United States

3.  JOSHUA COOLEY, Defendant

      /s/ Ashley Harada
      _____
      Ashley Harada