UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
LAW ENFORCEMENT SERVICES
UNIFORM DIVISION

# POLICE OFFICERS CASE REPORT

CASE NUMBER: BO16027059

TITLE OF CASE: U.S. V Cooley, Joshua James (DOB: 04/15/1984)

OFFENSE: Investigation Pending; Referred to BIA Drug Task Force

STATUTE: Pending Investigation

LOCATION OF INCIDENT: 16 Mile Maker Highway 212

DATE OF INCIDENT: February 26th, 2016

INVESTIGATING OFFICER: James D. Saylor

CROW AGENCY POLICE DEPARTMENT
PO BOX 69 CROW AGENCY, MONTANA 59022
(406) 638-2631 FAX (406) 638-2970

USAO - 011               Exhibit 501

# POLICE OFFICER CASE REPORT

Case Number: BO16027059

| NAME OF COMP./ REP. PARTY/VICTIM: On View of Officer | ADDRESS AND TELEPHONE NUMBER: Crow Police Department |
|---|---|

PERSON{S}/VEHICLE{S} INVOLVED:
Driver (arrested): Cooley, Joshua James (DOB: 04/15/1984)
Vehicle: WHITE IN COLOR 2007 DODGE RAM 1500 PICKUP BEARING WY REGISTRATION: 3-23876
(VIN: 3D7KS19D67G746110)
Passenger:
Juvenile Male Child Approximately 2 years of age

Narrative:

At or about 0102hrs on Saturday 02/26/20156, while in the performance of my duties as a Highway Safety Law Enforcement Officer within the exterior boundaries of the Crow Indian Reservation, I observed a vehicle parked along the westbound shoulder of Highway 212 near the 16 mile marker. The vehicle was subsequently identified as a: WHITE IN COLOR 2007 DODGE RAM 1500 PICKUP BEARING WY REGISTRATION: 3-23876
(VIN: 3D7KS19D67G746110)

In the performance of my duties, it is not uncommon for me to come along motorists along Highway 212 that are in need of assistance. On numerous occasions I have rendered assistance to individuals who were out of gas, experiencing mechanical difficulties, or were lost. It is also often the case that due to limited cell phone service areas, such as the 16 mile marker, motorists have no way to contact anyone for help.

As part of a function of my position as a Highway Safety Officer for the Crow Indian Reservation, it is not only one of my responsibilities as a function of my position, but I am duty bound as a law enforcement officer to ensure the well-being of those utilizing the roadways of the Crow Indian Reservation. I decided to stop and conduct a welfare check of the occupants of the Dodge.

I had been traveling eastbound at the time I had spotted the Dodge. I turned around and approached the Dodge. I activated the emergency lighting in the rear of my police unit so as to warn oncoming westbound traffic of the road hazard created by having two vehicles parked along the shoulder of the road. I intentionally did not activated my front emergency lighting equipment as I did not want the occupants of the Dodge to feel as though I was detaining them or "pulling them over".

I radioed my activities to the Crow Agency Dispatch and approached the Dodge on foot. As I approached the Dodge, I noticed that it was running. I could hear the engine and exhaust noise. There was a large amount of stuff in the open bed of the truck. The bed was full almost up to the bed raise with what appeared to be tools, a transmission, and other such mechanical type of items. I could not see inside of the Dodge very well as the windows were heavily tinted. I thought I could see movement between the rear and front seat of the Dodge but was unsure as visibility was very poor.

I knocked on the truck and asked if everything was okay. The rear passenger window of the truck rolled down slightly and I could make out what appeared to be the head of a small near the center console of the truck. I announced "law enforcement, is everything okay?" and continued to approach cautiously.

I shined my flashlight into the front driver compartment where I could see the figure of a man in the driver seat. The man was subsequently identified as: Cooley, Joshua James (DOB: 04/15/1984). It appeared as though Joshua had raised his right hand as he was looking out the window toward me and motioned his thumb

USAO - 012

Exhibit 501

downward in a "thumbs down" type of fashion. I did not know for sure what Joshua had meant by the gesture but surmised that thing were not well.

I asked Joshua if he could roll down the driver window so that I could speak with him. Joshua's window rolled partially down and I was able to confirm that there was a small male child (approx 2 or 3 years of age) inside of the Dodge who appeared to be trying to climb from the back seat up to the front driver seat. I couldn't see much else as the driver had not rolled the window all the way down and the tint continued to block my view. I could not tell for sure if there were other occupants in the vehicle but it did appear as though the back seat of the truck was loaded with belongings. I was only able to see shadows of objects, but could tell there was something in the space of the back seat

Joshua advised that he had pulled over because he had gotten tired from his drive. Joshua helped the juvenile child into the front seat with him while I was speaking with him. I apologized to Joshua, thinking that I may have woken his child. Joshua stated that it was okay, and again assured me that he had only pulled over because he was tired.

I had assumed Joshua had been driving for a while considering it was late at night, on a highly traveled thoroughfare (Highway 212) and the license plate on the truck was from out of state. I asked Joshua where he had come from and was surprised when he answered "Lame Deer", which as only approximately 26 miles away from our location. My assumption that he had been driving a long time seemed wrong.

Additionally, I had worked in and around Lame Deer as a Police Officer for the Northern Cheyenne Indian Reservation for over two years. During that time, I found it quite common to see vehicles in the area with Wyoming License Plates, however, most usually the drivers of the vehicles appeared to be Native American and were from other Indian Reservations. Joshua did not appear to be Native, and I did not recognize his vehicle from my time spent in Lame Deer as an Officer.

I asked Joshua why he had been in Lame Deer. Joshua advised that he had come up from Wyoming purchase a vehicle. The vehicle that Joshua was driving appeared as though was not something that he had just purchased as the bed was loaded with items, and there appeared to be a large quantity of personal items in the rear seat.

I asked Joshua why he was buying a vehicle in the middle of the night. Joshua advised that he had "broke down" so he was driving the Dodge. Joshua advised that the Dodge belonged to a person he identified as "Thomas". Joshua said that he was buying a vehicle from "Thomas" but had broken down, so Thomas was allowing him to use the truck to "get back". I asked Joshua what Thomas's last name was. Joshua seem to talk while answering, stating that he was not sure. Joshua listed two names, "Spang" and "Shoulderblade", but settled on "Shoulderblade" as what he thought Thomas's last name was.

Through my time as an Officer on the Northern Cheyenne Indian Reservation, I had come to know there to be both a Thomas Spang and Thomas Shoulderblade. I knew Thomas Shoulderblade to be a probation officer for the Tribe, and at one point, a rookie Officer for the Police Department before quitting. Additionally, I knew the name Thomas Spang to be associated with drug activities on the Northern Cheyenne Reservation and had worked cases during which his name had come up as having committed illicit and suspected illegal activities involving weapons and controlled substances.

As I spoke with Joshua I became confused. I could not understand why Joshua was driving a vehicle that had Wyoming license plates which he was claiming belonged to Thomas Spang/Shoulderblade. It made no sense to me that he had driven to Lame Deer to purchase a vehicle, but did not have another passenger with him that would have driven a new purchase home. I could not understand why the potential seller of the new vehicle would allow him to drive his truck. Nothing about Joshua's explanation made any sense to me. Nothing seemed practical or rational.

USAO - 013

Exhibit 501

I questioned Joshua more about the situation, and told him that nothing he had said to me made any sense. Joshua became agitated and stated "i don't know how it doesn't make any sense, I told you I cam up to buy a vehicle". I told Joshua that I understood that to be what he said, but didn't how that could be the case.

It was obvious that Joshua was becoming nervous. Joshua's began to speak in a lower volume making it difficult for me to hear him, his hands began to shake, and Joshua began taking long periods of times to answer seemingly simple questions. I told Joshua that I couldn't hear him and asked him to roll the window down further, he complied.

When he rolled the window down it exposed to my view the butt of two rifles laying against the front passenger seat. The barrels were pointed toward the floor board they were propped against the front passenger seat. The rifles appeared to be semi-automatic assault weapons. I asked Joshua about the guns. Joshua advised that they were not his, and claimed that they belonged to "Thomas".

At that point, I felt lead to believe by Joshua that he had gone to Lame Deer to purchase a vehicle, but had broken down and was allowed to borrow the sellers vehicle, however, I could not reconcile why the seller would would allow Joshua to borrow a truck, loaded with personal items to include firearms, why the transaction was occurring in the middle of the night, and why the truck was bearing Wyoming registration.

Joshua became increasing nervous and appeared as though he was becoming agitated. As I continued to probe Joshua for a response that would explain the discrepancies, he stated to me several more times "i don't know what doesn't make sense, I told you I came to buy a vehicle", but he would not provide a reasonable response about the situation.

Moreover, while speaking with Joshua I noticed that his eyes were very watery and blood-shot, his words were sometimes slurred and at times it almost sound as if he had a faint foreign accent (such as Russian) and he seemed confused by simple questions. I began to suspect Joshua to be impaired.

I asked Joshua if there were any other weapons in the vehicle. Joshua looked around inside the Dodge but would not provide a direct response to my question. Joshua became very elusive and defensive, stating "I told you, I just pulled over because I was tired".

I asked Joshua if he had his identification with him. He advised that he did and indicated that it was in him pants pocket. Joshua reach with his right hand toward his front right pant pocket while continuing to hold his son in his lap with his left hand. I watched Joshua dig around for a moment and then remove what appeared to be wad of money from his pocket. Joshua placed the money in a compartment of his dash. Joshua did this several times, each time I noticed the denominations of the bills appeared to be twenties, fives, and ones. Each time Joshua did this, it seemed to take him longer to remove the next item from his pocket. Joshua glanced at me several times while moving his hand back and forth from the dash to the area of his pocket. I could not see exactly what he was doing with his right hand but my training and experience told me to exercise extreme caution; I removed my service pistol from its holster and held it to my side.

Eventually, Joshua reached back toward his front right pocket, however, it appeared that his hand did not go into his pocket but rather beside his pocket between him and center seat. I noticed Joshua's breathing became more shallow and rapid and Joshua stopped looking over toward me. Joshua began to stare intently forward and had what it commonly described as a "thousand yard stare". Joshua's change in demeanor was an indicator to me that he was contemplating attacking me. Joshua kept his hand in the area for an extended period of time and appeared frozen. I told Joshua to "stop, show me your hands, do it now!".

Joshua seemed startled by my sudden command and quickly put his right hand up where I could see it. I told Joshua that he was no longer allowed to move his hand without my permissions. I kept my service pistol drawn and ordered Joshua to slowly reach to his right pocket and remove only his identification, no more

messing around with other items I his pocket.

I shined my flashlight directly toward the area where Joshua was reaching and could tell that he was again placing his hand in his pocket. Joshua slowly retrieved a Wyoning Driver's license (107201-725) and handed to me. I told him to keep his hands were they could be seen as I inspected the license.

Because of the height of Joshua's truck, the obstruction of Joshua's son seated in his lap, and the fact that I knew their to be weapons on the passenger side of the truck I decided to re-position myself to the passenger side of the vehicle. Additionally, I had requested the presence of another patrol to my location, however, was not able to reach out on my portable radio and did not want to return to my unit and allow Joshua the opportunity to cause me harm. I felt that by placing a bigger barrier and distance between he and I, that I would be safer until back-up came to check on my status.

I moved quickly to the passenger side of the truck and opened the front passenger door to continue speaking with Joshua. When I opened the passenger door I could tell the assault rifles did not appear be loaded. As I shift my gaze back toward Joshua I noticed the handle of a pistol tucked under the center folding seat where Joshua had being lingering with his right hand.

I reached in and quickly removed the pistol and secured it by removing loaded magazine (7 rounds in magazine) and a removing a round from the chamber. I asked Joshua why he did not tell me there was another weapon in the vehicle when I had asked him. Joshua stuck with his claim that the vehicle and it's contents belonged to "Thomas".

I attempted again to gain a reasonable explanation as to what was going on. I asked Joshua again why there were so many weapons in the vehicle. Joshua became very nervous and would not speak in complete thoughts. Joshua stated that he was a mechanic and some times takes things in trade. Joshua advised that he was going to buy a Ford Explorer that had been posted on Facebook. Joshua advised that the person he was buying the Ford from knew his location and was going to be coming to him shortly. Joshua stated that he was trying to get "Thomas" truck to Crow Agency and that he was suppose to drop it off. As Joshua became increasing anxious he began spouting a proliferation of excuses, non of which made any sense.

It caused me concern that Joshua had indicated that he was expecting someone to meet him along the roadside. Nothing Joshua said had made any sense, however, base on my observations I was beginning to believe that Joshua was waiting to meet someone for some type of an exchange of an illicit nature.

It was the middle of the night, there were multiple weapons present, there was large quantities of small denomination bills, there was no legitimate explanation from Joshua to simple questions, and there was an indication that someone was going to be meeting with Joshua.

Joshua again began to place his right hand out of sight, this time between his body and the center folding seat. I ordered Joshua to show me his hands and told him to step out of the vehicle. I met Joshua back on the driver side of the truck, he had exited holding the child.

I asked Joshua if he had any weapons on his person, he stated that he did not, however, I could see a large bulge in in his front right pocket. I asked what it was. Joshua stated that it was credit cards. I felt the bulge and did not feel anything that resembled a weapon. I told Joshua to step toward my patrol unit.

As I began to escort him and his child to my unit Joshua paused and asked if he could remove the money from his pocket. I told Joshua to stand in front of my unit and advised him he could removed anything he wanted to from his pockets. Joshua began to place a large quantity of money on the hood of my unit, mostly in small denominations. Joshua claimed that the money was for the Ford Explorer that he was supposedly in Lame Deer to purchase.

Exhibit 501

While he emptied his pockets I could see into an opening of his pull over type top. The shirt had a pocket that went all the way across the front of his stomach. Inside there was a small plastic baggy which I knew through my training and experience to resemble that of marijuana packaging. The baggy appeared empty, however, it appeared as though it use to be tied in fashion in which I am familiar with being associated with controlled substance. I removed the baggy from Joshua and questioned him about what the contents of the bag use to be. Joshua would not answer only to state that it was "just a plastic bag".

I again tried to call out of my hand held radio for another patrol unit, however,

I escorted Joshua around to the side unit and had him sit inside the rear passenger area. I told Joshua that he was being detain investigation. Joshua stated that he did not think that it was legal for him to be detained by the BIA and wanted to know if I could "do that". I told him again that he was being detained as I suspected their to be crime afoot.

I secured the money that Joshua had placed on my unit by tucking it under the wiper bladed of my front windshield. While securing the money I noticed several small zip lock baggies in with the money. I recognized the baggies as the type of packaging material commonly used for the sale of methamphetamine and commonly refereed to as "bindles" when filled with methamphetamine. The baggies were empty, and clean, indicating me to that they h ad not yet been used, which indicated to me that Joshua may have a reason to need empty drug packaging baggies. I asked Joshua about the empty bindles which were in with his money, he stated that he "didn't see any" bindles.

I used my patrol unit radio and was able to get a hold of my dispatch. I requested another officer respond to my location as well as a county Deputy as Joshua appeared to be non-native. Shortly thereafter Lt. Brown, Officer Spotted Bear, and Officer Eastman responded to the scene.

I returned to the Dodge to secure the weapons and conduct checks on them. While securing the items I check reached over the to the driver side and turned the truck off. While turning off the truck I observed ammunition on the driver seat. I secured the three weapons that were in plain sight and decided to check the driver side where I had seen the ammunition to see if another weapon was present.

While checking the driver side I noticed a plastic bag stuffed with what appeared to be a white powerlessly crystalline substance which I believed to be methamphetamine. The bag was tucked between the driver seat and the center folding seat but was exposed in plain view. Beside the bag was a glass methamphetamine smoking pipe.

In addition to the suspected methamphetamine and paraphernalia, I noticed there to be multiple cellular phones on the dash board of the truck. In my training and experience the combination of controlled substances, weapons, large quantities of small denomination bills, and the presence of multiple means of communication, are all indicators of drug dealing.

Upon arrival of Supervisory Police Officer Sharron Brown I informed her of the situation. Lt. Brown instructed me to seize whatever I had discovered in plain view within the Dodge. Lt. Brown advised that she was going to contact the BIA Drug Task Force agents for further guidance.

I photographed the drug and began collecting the evidence as instructed. I decided to seize all weapons, suspected controlled substances, money, drug paraphernalia, ammunition, and electronics such as cell phones and communication devices which were in plain view.

While removing the items from the Dodge I located what appeared to be an "Iphone" case beneath the front driver seat. I was going to take the phone out of the box, however, when I opened the box I discovered there

USAO - 016

Exhibit 501

was no phone. The box was full of a white powdery crystalline substance similar to that which had already been discovered. Moreover, while removing drug paraphernalia from the driver door panel, another baggie of white powdery crystalline substance was discovered. I photographed as I collected with the assistance of Officers Eastman and Spotted Bear who had arrived to assist. (SEE EVIDENCE CUSTODY DOCUMENTS AND PHOTOGRAPHS FOR DETAILS OF WHAT WAS SEZIED ON SCENE)

Further coordination with Lt. Brown resulted in the decision to have the Dodge Towed to the Crow Police Department. While waiting for the tow, Deputy Gibbons of the Bighorn County Sheriffs Officer responded to assist. Deputy Gibbons further coordinated with Lt. Brown and SA Kevin Proctor resulting in the decision to have Joshua and his son transported to the Crow Agency Police Department to be interview by SA Kevin Proctor of the BIA.

I secured the items seized from the Dodge in the trunk of my patrol unit. I sealed the Doors, gas cap, and hood of the Dodge with evidence tap and Lt. Brown remained on scene for sight security until the tow could arrive. I advised Joshua of his legal rights and transported Joshua and his child to the Crow Police Department where I met with SA. K. Proctor and explained the situation.

SA Proctor took possession of all suspected controlled substances (approximately 260 grams) and cell phones that I had seized during my initial contact with Joshua (see evidence custody document). SA Proctor conducted invited an Investigator from Sheridan Wyoming to participate in the investigation. SA Proctor and the Investigator from Sheridan conducted an interview with Joshua at the Crow Police Department resulting in Joshua choosing to sign written consent to search the remainder of the Dodge for additional evidence (see report of K. Proctor for details of his interview with Joshua for which I was not present).

During this investigation it was revealed that Joshua's license was suspected. Joshua was subsequently arrested by Deputy Gibbons for state driving offenses and criminal endangerment of a child. Joshua was transported to the Bighorn County Jail for booking.

Lt. Brown coordinated identified the mother of Joshua's child and made arrangements for the child to be picked up by the mother. The Montana Department of Family Services was also notified of this incident. (please refer to report of Lt. Brown for additional information of her actives during this investigation).

Upon arrival of the Dodge to the Crow Police Department the consent to search was executed upon the truck which revealed several additional items of evidence to include but limited to an additional 96 grams of suspected methamphetamine, an AK-47 style assault rife, and thermal imaging devices and radio equipment believed to be the property of the U.S. Government (BIA). [SEE EVIDENCE CUSTODY DOCUMENTS FOR DETAILS OF ITEMS SEIZED]

All items seized where photographed, documented, sealed, and secured in evidence property lockers. During processing of the evidence I conducted a field test kit of residue located on seized drug paraphernalia which resulted in a presumptive postie result for the presence of methamphetamine.

The money seized was counted and totaled to be $2,655.

Further investigation is forwarded to the BIA Drug Task Force. Physical evidence, photographs, dash video/audio available upon request. I declare under penalty of perjury that the information as set forth above is true and correct to the best of my knowledge.

ARREST MADE {X} INVESTIGATING OFFICERS {} UNFOUNDED {} SOLVED EXCEPTIONALLY {}

OFFICER'S SIGNATURE: _____ BADGE#: 139

James D. Saylor
USAO - 017

Exhibit 501