IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED
FEB 07 2017
Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA JAMES COOLEY,<br><br>Defendant. | CR 16-42-BLG-SPW<br><br>ORDER |

Defendant Joshua James Cooley (Cooley) is charged with Possession of Methamphetamine with Intent to Distribute and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. (Doc. 1). He has moved to suppress evidence under the Indian Civil Rights Act (ICRA) and the Fourth Amendment. (Doc. 33).

On January 6, 2017, the Court held an evidentiary hearing. The Court heard testimony from Tribal Highway Safety Officer James Saylor and Bureau of Indian Affairs Special Agent Kevin Proctor. Having read and reviewed the parties' submissions and having heard the testimony of the witnesses noted above, the Court GRANTS Cooley's motion.

1

## I. Statement of facts

Around 1:00 AM on February 26, 2016, Tribal Highway Safety Officer James Saylor (Officer Saylor) was traveling eastbound on State Highway 212 within the exterior boundaries of the Crow Reservation when he noticed a white pickup truck stopped on the shoulder of the westbound lane. Officer Saylor, knowing this portion of Highway 212 has bad cellphone reception, turned his vehicle around and pulled up behind the truck to see if the truck's occupants needed assistance. As he pulled up behind the truck, Officer Saylor turned on his rear emergency lights but did not turn on his overhead lights. The truck had an extended cab and Wyoming plates.

The truck's engine was running. With his flashlight on, Officer Saylor approached the driver's side of the truck and knocked on the truck's side. The rear driver's side window rolled partway down and then back up. In the backseat, Officer Saylor saw a child's car seat and a small child crawling to the front of the truck. As Officer Saylor came to the front driver's side window, he saw Cooley in the driver's seat. Officer Saylor asked Cooley to roll his window down, which Cooley did about six inches. The child was sitting in Cooley's lap, content.

Officer Saylor observed Cooley was non-Indian and had bloodshot, watery eyes. Officer Saylor did not smell any alcohol. Officer Saylor asked Cooley if everything was okay. Cooley responded that everything was fine, he pulled over

because he was tired. In Officer Saylor's experience, it is common for travelers along this stretch of highway to pull over because they are tired. Officer Saylor asked Cooley where he'd come from, to which Cooley responded Lame Deer, about 26 miles away. Officer Saylor could not tell whether Cooley's speech was slurred.

Officer Saylor pressed Cooley on his answer, asking him what his business was in Lame Deer, who he had seen, and why he was traveling so late. Cooley explained he had been there to purchase a vehicle but the vehicle had broken down. He further explained the truck he was in was loaned to him by either a Thomas Spang or a Thomas Shoulderblade. Officer Saylor knew both a Thomas Spang and a Thomas Shoulderblade. Thomas Spang was a person Officer Saylor suspected of drug activity on the Northern Cheyenne Reservation. Thomas Shoulderblade was a former probation officer with the Bureau of Indian Affairs on the Northern Cheyenne Reservation.

Officer Saylor suspected Cooley was not telling the truth and asked Cooley to roll his window down further. When Cooley rolled the window down, Officer Saylor saw the butts of two semiautomatic rifles in the front passenger seat and observed the center console was folded down. Officer Saylor asked Cooley about the rifles. Cooley stated they belonged to the owner of the truck, Thomas. Officer

Saylor asked Cooley for some identification. The child was still sitting in Cooley's lap.

Cooley reached into his right pants pocket and pulled out a wad of cash, which he placed on the dashboard. Cooley did this two or three times. The last time Cooley reached toward his pocket, his breath became shallow and his hand hesitated slightly around his pocket area. Officer Saylor drew his service pistol, held it to his side, and ordered Cooley to stop and show his hands. Cooley immediately complied, attempting to raise both his hands while holding onto the child in his lap. Officer Saylor told Cooley he was no longer allowed to move his hands unless told to do so. Officer Saylor instructed Cooley to slowly reach into his pocket and retrieve his identification. Cooley complied and produced a Wyoming driver's license.

Using his portable unit, Officer Saylor, attempted to radio dispatch to run Cooley's identification. Officer Saylor could not reach dispatch because the portable unit had poor reception in this area. The unit in Officer Saylor's patrol car was capable of reaching dispatch because it had much better reception than the portable unit. Instead of returning to his patrol unit, Officer Saylor maneuvered around the truck to the passenger side and opened the door. Officer Saylor saw that the two semiautomatic rifles in the passenger seat were unloaded. He also saw there was a pistol tucked underneath the folded down center console. Officer

Saylor asked Cooley why he hadn't said anything about the pistol. Cooley responded he did not know it was there because the truck and its contents belonged to Thomas.

Officer Saylor reached into the truck under the center console, removed the pistol, removed the magazine from the pistol, and removed a round from the pistol's chamber. Officer Saylor ordered Cooley out of the truck. Cooley, holding the child, exited the truck and met Officer Saylor at the rear of the truck. Officer Saylor patted Cooley down and, after finding no weapons, ordered Cooley into the back of the patrol unit. Cooley asked Officer Saylor if he could empty his pockets first, to which Officer Saylor said yes. Cooley removed cash, credit cards, and a few small Ziploc bags from his pockets and placed the items on the patrol car's hood. The Ziploc bags were empty.

Officer Saylor placed Cooley and the child in the patrol car's backseat and radioed dispatch to send another unit and, because Cooley was non-Indian, a county unit. Officer Saylor returned to the truck to retrieve the rifles. The truck was still running. From the passenger side, Officer Saylor reached across the seats to remove the keys from the ignition. While reaching for the keys, Officer Saylor saw a glass pipe and a plastic bag containing a white powder wedged between the driver seat and middle seat. Shortly thereafter, Bureau of Indian Affairs Lieutenant Sharon Brown and Big Horn County Deputy Gibbs arrived. Lt. Brown instructed

Officer Saylor to seize all contraband in the truck within plain view. Subsequent searches discovered more white powder, which was later determined to be methamphetamine.

## II. Law

### A. Standard of review

Whether an investigatory stop was proper is reviewed de novo. *United States v. Becerra-Garcia*, 397 F.3d 1167, 1170 (9th Cir. 2005). Factual findings are reviewed for clear error. *Becerra-Garcia*, 397 F.3d at 1171.

### B. The scope of Officer Saylor's authority

Tribes have the power to exclude non-Indians they deem undesirable from tribal lands. *Duro v. Reina*, 495 U.S. 676, 696-697 (1990). Pursuant to that power, tribal police have the authority to investigate on-reservation violations of state and federal law by non-Indians. *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1180 (9th Cir. 1975). However, tribes have no power to exclude non-Indians from a public right of way that crosses the reservation. *Bressi v. Ford*, 757 F.3d 891, 895-896 (9th Cir. 2009). Tribal police therefore have no authority to investigate violations of state and federal law by non-Indians on a public right of way that crosses the reservation. *Bressi*, 575 F.3d at 896. But tribal police do not have to overlook obvious violations of state or federal law by non-Indians on a public right of way that crosses the reservation. *See Strate v. A-1 Contractors*, 520 U.S. 438,

6

455-456 n. 11 (1997). A tribal officer that reasonably suspects a person of violating tribal law on a public right of way that crosses the reservation must determine, shortly after stopping the person, whether the person is Indian. *Bressi*, 575 F.3d at 896. If the person is non-Indian, the tribal officer may detain the person for the reasonable time it takes to turn the person over to state or federal authorities only when "it is apparent that a state or federal law has been violated." *Bressi*, 575 F.3d at 896.

Although the Ninth Circuit has not yet articulated the guideposts of *Bressi*'s "apparent" standard, precedent indicates the standard is more stringent than particularized suspicion and probable cause. First, *Bressi* uses "apparent" and "obvious" interchangeably. 575 F.3d at 896-897. Particularized suspicion and probable cause require considerably less of police officers than an obvious law violation. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (reasonable suspicion requires "some minimal level of objective justification."); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (probable cause requires "a fair probability that contraband or evidence of a crime will be found."). Second, *Bressi*'s "apparent" standard was a carefully drawn exception borne of practical necessity: tribal police have no power to exclude, i.e. investigate, non-Indians on public right of ways, yet, as police officers, should not have to turn a blind eye to an obvious violation of state or federal law. *Bressi*, 575 F.3d at 895-896. Construing "apparent" to require

no more than reasonable suspicion or probable cause would undermine *Bressi*'s purpose and grant the tribes power they do not have. The Court concludes *Bressi*'s "apparent" standard is notably higher than "probable cause."

The remedy for evidence obtained by a tribal officer acting outside the scope of his authority is suppression. "No Indian tribe in exercising powers of self-government" shall "violate the right of the people to be secure . . . against unreasonable search and seizures . . . ." 25 U.S.C. § 1302(a)(2). Under *Bressi*, a tribal police officer commits an unreasonable seizure when he detains a non-Indian on a public right of way that crosses the reservation unless there is an apparent state or federal law violation. *Bressi*, 575 F.3d at 896. Suppression of evidence in a federal proceeding is appropriate if the tribal officer's conduct violated § 1302(a)(2). *See Becerra-Garcia*, 397 F.3d at 1171.

### III. Officer Saylor had no authority to detain Cooley because he quickly determined Cooley was non-Indian and it was not apparent Cooley had violated a state or federal law when the seizure occurred

Whether a seizure occurred is analyzed under the Fourth Amendment because, although the Fourth Amendment technically does not apply to conduct by tribal police, the ICRA imposes identical limitations. *Becerra-Garcia*, 397 F.3d at 1171.

A seizure occurs when an officer, through coercion, "physical force, or a show of authority, in some way restricts the liberty of a person." *United States v.*

*Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004). A person's liberty is restrained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Washington*, 387 F.3d at 1068 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). The Ninth Circuit has identified five factors that aid in determining whether a reasonable person would have felt "at liberty to ignore the police presence and go about his business." *Washington*, 387 F.3d at 1068. The factors are: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter. *Washington*, 387 F.3d at 1068.

Here, Officer Saylor seized Cooley when he drew his weapon, ordered Cooley to show his hands, and commanded Cooley to produce identification. A reasonable person would not feel free to ignore the commands of a police officer with a weapon drawn. *Washington*, 387 F.3d at 1068.

Normally, under *Bressi*, Officer Saylor would be required to determine whether Cooley was non-Indian shortly after seizing him. 575 F.3d at 896. However, Officer Saylor determined Cooley was non-Indian when Cooley initially

9

rolled his window down. Because Cooley was non-Indian, Officer Saylor had the authority to detain Cooley only if it was "apparent" Cooley had violated state or federal law. *Bressi*, 575 F.3d at 896. Officer Saylor's observations up to that point fell considerably below an "apparent" state or federal law violation. When Officer Saylor seized Cooley, he had observed bloodshot and watery eyes, no odor of alcohol, possible but unconfirmed slurred speech, two semi-automatic rifles, wads of cash in Cooley's pocket, and answers to questions that seemed untruthful to him. Officer Saylor had also heard Cooley explain that he pulled over because he was tired—an occurrence Officer Saylor acknowledged was common on Highway 212—and that the vehicle did not belong to him but instead to a Thomas Spang or Thomas Shoulderblade, one of whom Officer Saylor suspected of drug activity and one of whom was a former probation officer. None of Cooley's actions, whether taken individually or cumulatively, establish an obvious state or federal law violation. The Court holds Officer Saylor exceeded the scope of his authority when he detained Cooley. All evidence obtained subsequent to Cooley's seizure is suppressed because it is "fruit of the poisonous tree." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

The Government argues the evidence should not be suppressed because the inevitable discovery exception to the "fruit of the poisonous tree" doctrine applies.

The inevitable discovery exception allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. *Ramirez-Sandoval*, 872 F.2d at 1396 (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The exception requires that "the fact or likelihood that makes the discovery inevitable arises from the circumstances other than those disclosed by the illegal search itself." *United States v. Boatwright*, 822 F.2d 862, 864-65 (9th Cir. 1987). The Government failed to introduce any evidence that the search of the truck would have occurred without the illegal seizure of Cooley. Therefore, the inevitable discovery exception to the fruit of the poisonous tree doctrine does not apply.

## IV. Conclusion

For the reason stated above, Cooley's Motion to Suppress (Doc.33) is GRANTED.

DATED this 7th day of February, 2017.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge

11