IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, **Plaintiff,** vs. **JOSHUA JAMES COOLEY,** Defendant. | CR 16-42-BLG-SPW **ORDER** |

Before the Court is Defendant Joshua James Cooley's Motion to Suppress, filed November 4, 2016. (Doc. 33). The Motion comes to the Court on remand from the Ninth Circuit and United States Supreme Court in order for the Court to determine the following question: "If—as the Supreme Court held—the tribal officer otherwise possessed the relevant authority, 'whether the officer had probable cause for a search or arrest, or reasonable suspicion for an investigatory detention.'" (Doc. 101 at 1) (quoting *United States v. Cooley*, 919 F.3d 1135, 1145 (9th Cir. 2019)). The Court ordered supplemental briefing on the matter. Cooley filed an initial brief on September 14, 2021. (Doc. 112). The Government responded on October 8, 2021. (Doc. 115). Cooley replied on October 25, 2021.

1

(Doc. 118). The matter is deemed ripe and ready for adjudication. For the following reasons, the Court denies Cooley's Motion to Suppress.

## I. STATEMENT OF FACTS

The facts of this case, having been previously determined by this Court without issue, shall be repeated here for convenience.

Around 1:00 AM on February 26, 2016, Tribal Highway Safety Officer James Saylor (Officer Saylor) was traveling eastbound on State Highway 212 within the exterior boundaries of the Crow Reservation when he noticed a white pickup truck stopped on the shoulder of the westbound lane. Officer Saylor, knowing this portion of Highway 212 has bad cellphone reception, turned his vehicle around and pulled up behind the truck to see if the truck's occupants needed assistance. As he pulled up behind the truck, Officer Saylor turned on his rear emergency lights but did not turn on his overhead lights. The truck had an extended cab and Wyoming plates.

The truck's engine was running. With his flashlight on, Officer Saylor approached the driver's side of the truck and knocked on the truck's side. The rear driver's side window rolled partway down and then back up. In the backseat, Officer Saylor saw a child's car seat and a small child crawling to the front of the truck. As Officer Saylor came to the front driver's side window, he saw Cooley in

2

the driver's seat. Officer Saylor asked Cooley to roll his window down, which Cooley did about six inches. The child was sitting in Cooley's lap, content.

Officer Saylor observed Cooley was non-Indian and had bloodshot, watery eyes. Officer Saylor did not smell any alcohol. Officer Saylor asked Cooley if everything was okay. Cooley responded that everything was fine, he pulled over because he was tired. In Officer Saylor's experience, it is common for travelers along this stretch of highway to pull over because they are tired. Officer Saylor asked Cooley where he'd come from, to which Cooley responded Lame Deer, about 26 miles away. Officer Saylor could not tell whether Cooley's speech was slurred.

Officer Saylor pressed Cooley on his answer, asking him what his business was in Lame Deer, who he had seen, and why he was traveling so late. Cooley explained he had been there to purchase a vehicle, but the vehicle had broken down. He further explained the truck he was in was loaned to him by either a Thomas Spang or a Thomas Shoulderblade. Officer Saylor knew both a Thomas Spang and Thomas Shoulderblade. Thomas Spang was a person Officer Saylor suspected of drug activity on the Northern Cheyenne Reservation. Thomas Shoulderblade was a former probation officer with the Bureau of Indian Affairs on the Northern Cheyenne Reservation.

3

Officer Saylor suspected Cooley was not telling the truth and asked Cooley to roll his window down further. When Cooley rolled the window down, Officer Saylor saw the butts of two semiautomatic rifles in the front passenger seat and observed the center console was folded down. Officer Saylor asked Cooley about the rifles. Cooley stated they belonged to the owner of the truck, Thomas. Officer Saylor asked Cooley for some identification. The child was still sitting in Cooley's lap.

Cooley reached into his right pants pocket and pulled out a wad of cash, which he placed on the dashboard. Cooley did this two or three times. The last time Cooley reached toward his pocket, his breath became shallow, and his hand hesitated slightly around his pocket area. Officer Saylor drew his service pistol, held it to his side, and ordered Cooley to stop and show his hands. Cooley immediately complied, attempting to raise both his hands while holding onto the child in his lap. Officer Saylor told Cooley he was no longer allowed to move his hands unless told to do so. Officer Saylor instructed Cooley to slowly reach into his pocket and retrieve his identification. Cooley complied and produced a Wyoming driver's license.

Using his portable unit, Officer Saylor attempted to radio dispatch to run Cooley's identification. Officer Saylor could not reach dispatch because the

4

portable unit had poor reception in this area. The unit in Officer Saylor's patrol car was capable of reaching dispatch because it had much better reception than the portable unit. Instead of returning to his patrol unit, Officer Saylor maneuvered around the truck to the passenger side and opened the door. Officer Saylor saw that the two semiautomatic rifles in the passenger seat were unloaded. He also saw there was a pistol tucked underneath the folded down center console. Officer Saylor asked Cooley why he hadn't said anything about the pistol. Cooley responded he did not know it was there because the truck and its contents belonged to Thomas.

Officer Saylor reached into the truck under the center console, removed the pistol, removed the magazine from the pistol, and removed a round from the pistol's chamber. Officer Saylor ordered Cooley out of the truck. Cooley, holding the child, exited the truck and met Officer Saylor at the rear of the truck. Officer Saylor patted Cooley down and, after finding no weapons, ordered Cooley into the back of the patrol unit. Cooley asked Officer Saylor if he could empty his pockets first, to which Officer Saylor said yes. Cooley removed cash, credit cards, and a few small Ziploc bags from his pockets and placed the items on the patrol car's hood. The Ziploc bags were empty.

Officer Saylor placed Cooley and the child in the patrol car's backseat and radioed dispatch to send another unit and, because Cooley was non-Indian, a county unit. Officer Saylor returned to the truck to retrieve the rifles. The truck was still running. From the passenger side, Officer Saylor reached across the seats to remove the keys from the ignition. While reaching for the keys, Officer Saylor saw a glass pipe and a plastic bag containing a white powder wedged between the driver seat and middle seat. Shortly thereafter, Bureau of Indian Affairs Lieutenant Sharon Brown and Big Horn County Deputy Gibbs arrived. Lt. Brown instructed Officer Saylor to seize all contraband in the truck within plain view. Subsequent searches discovered more white powder, which was later determined to be methamphetamine.

## II.  STANDARD OF REVIEW

Whether an investigatory stop was proper is reviewed *de novo*. *United States v. Becerra-Garcia*, 397 F.3d 1167, 1170 (9th Cir. 2005). Factual findings are reviewed for clear error. *Becerra-Garcia*, 397 F.3d at 1171.

## III.  DISCUSSION

Cooley makes three arguments in his renewed motion to suppress: (1) Officer Saylor unlawfully seized Cooley without reasonable suspicion of criminal activity; (2) Because the seizure was unlawful, Officer Saylor's subsequent

6

searches of Cooley and the truck were also unlawful; and (3) Officer Saylor unlawfully arrested Cooley when the officer placed Cooley in the back of the patrol car because the officer lacked probable cause to believe Cooley committed a crime.

### *Officer Saylor's Seizure of Cooley*

The Fourth Amendment prohibits unreasonable searches and seizures including brief investigatory stops of persons or vehicles. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). A search or seizure is reasonable if the investigating officer conducts the search or seizure after obtaining reasonable suspicion of criminal activity. *Arvizu*, 534 U.S. at 273. Reasonable suspicion of criminal activity exists if the investigating officer can articulate particularized and objective facts supporting their inference. *Id*. A court must review the totality of the circumstances present to determine whether reasonable suspicion existed including the officer's experience and training. *Id*.

"A seizure occurs when a law enforcement officer, through coercion, 'physical force[,] or a show of authority, in some way restricts the liberty of a person.'" *U.S. v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *United States v. Chan-Jimenez*, 125 F.3d 1324, 1325 (9th Cir. 1997)). Law enforcement restricts a person's liberty when, based on the surrounding circumstances of the

7

encounter, law enforcement's conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). The Ninth Circuit has identified five factors to review when determining whether a seizure occurred: (1) the number of police officers present; (2) whether any weapons were displayed during the encounter; (3) whether the encounter occurred in a public or private place; (4) whether the police officer's manner would imply that compliance would be compelled; and (5) whether the officer informed the individual that he could terminate the encounter and walk away. *Id.*

Cooley argues he was illegally seized at three different points throughout his encounter with Officer Saylor. First, Cooley asserts Officer Saylor unlawfully seized him when Saylor persisted in questioning after learning that Cooley was resting but otherwise okay. Second, Cooley asserts Officer Saylor unlawfully seized him when Saylor challenged Cooley's explanation for being in Lame Deer and asked Cooley to roll his window down further. Third, Cooley asserts Officer Saylor unlawfully seized him when Saylor drew his service pistol and told Cooley he was no longer free to move. The Government contends the Court resolved the issue of seizure in its previous order by finding that "Officer Saylor seized Cooley

8

when he drew his weapon, ordered Cooley to show his hands, and commanded Cooley to produce identification." (Doc. 48 at 9).

The Government's position is correct. Cooley's arguments that Officer Saylor seized him prior to that moment are unpersuasive. Officer Saylor was alone when he first approached Cooley's vehicle and began questioning him. Saylor was uniformed but did not display a weapon until he drew his service pistol and commanded Cooley to stop moving. The encounter occurred in a public setting albeit at night with no one else around. Officer Saylor's manner prior to drawing his service pistol was not overly authoritative to the point that a reasonable person would feel compelled to comply and, while Saylor did not expressly inform Cooley that he could terminate the encounter and drive away, Saylor did not expressly command compliance until after he drew the pistol.

Given these circumstances, the Court finds that Officer Saylor did not seize Cooley until the moment Saylor drew his service pistol and ordered Cooley to show his hands. As this Court previously determined, "[a] reasonable person would not feel free to ignore the commands of a police officer with a weapon drawn." (Doc. 48 at 9).

The Court now turns to whether Officer Saylor had acquired the necessary reasonable suspicion of criminal activity to justify the seizure of Cooley by the

9

time Saylor drew his service pistol. Officer Saylor initiated the encounter with Cooley after observing a vehicle parked on the side of a highway in the middle of the night and wanting to check on the welfare of the vehicle's occupants. Upon approaching the vehicle, Officer Saylor had Cooley roll down his window and observed Cooley had watery, bloodshot eyes. However, Saylor himself acknowledged that bloodshot eyes alone is not enough to determine whether someone was impaired. Officer Saylor asked Cooley where he was coming from and Cooley responded that he came from Lame Deer—26 miles away. Officer Saylor asked Cooley what he was doing in Lame Deer and Cooley responded that he was purchasing a truck from a Thomas Spang or a Thomas Shoulderblade; Saylor was unsure of which name Cooley said. Officer Saylor knew Shoulderblade to be an ex-employee with the Bureau of Indian Affairs and suspected Spang of involvement with drug trafficking. That vehicle had broken down, however, and Cooley was driving either Spang's or Shoulderblade's personal vehicle. Officer Saylor found the information confusing and had a hard time hearing Cooley, but Saylor could not determine if Cooley was slurring his words or not. Officer Saylor asked Cooley to roll his window down further at which point Saylor observed the butts of two rifles on the passenger side of the vehicle. However, Saylor did not find this particularly alarming as "just having weapons in a vehicle, especially in

Montana, isn't cause for too much alarm." (Doc. 58 at 17). Officer Saylor then asked Cooley for his identification and Cooley began reaching into his pants pocket and pulling out small denomination bills but no identification. Cooley did this two or three times without producing any identification until Saylor observed that Cooley stopped moving for a moment, stared straight ahead, and his breathing became shallow and rapid. Saylor believed this to be what law enforcement calls a "thousand-yard stare" and thought it could be a pre-cursor to a possible assault. (*Id.* at 20). At that moment, Saylor drew his pistol, held it by his side, and ordered Cooley to stop moving and show his hands.

Cooley argues these facts did not provide Officer Saylor with sufficient reasonable suspicion to draw his weapon and seize Cooley because there was no indication of criminal activity occurring. Officer Saylor's observations of Cooley's bloodshot eyes and the rifles in the vehicle were not enough for reasonable suspicion, according to Cooley, because Saylor admitted the eyes alone did not indicate impairment and it was not uncommon to have rifles in a vehicle in Montana. Further, Cooley asserts that while Officer Saylor was confused and suspicious about Cooley's responses and whether he purchased a vehicle from Thomas Spang or Thomas Shoulderblade, that confusion did not reasonably indicate criminal activity. The Government responds that Cooley's explanation for

11

why he was parked on the side of road in the middle of night made no sense and, when coupled with the bloodshot eyes and difficult-to-understand speech, provided Officer Saylor with articulable facts that criminal activity like driving while impaired or drug trafficking was occurring.

Based on the facts presented to Officer Saylor prior to drawing his service pistol, the Court agrees with Cooley and finds that Officer Saylor did not have the required reasonable suspicion of criminal activity to seize Cooley. Saylor himself dismissed the presence of Cooley's bloodshot eyes and the rifles as not immediately concerning. Saylor could not conclusively determine that Cooley slurred his words and so could not further determine whether Cooley was impaired. Without those articulable facts, Officer Saylor did not acquire the reasonable suspicion of criminal activity to seize Cooley.

However, Officer Saylor did have a reasonable belief that Cooley was dangerous and had access to weapons allowing the officer to seize Cooley and mitigate that danger. When a police officer possesses a reasonable belief, based on specific and articulable facts, that the suspect poses a danger to the officer's safety and that the suspect has immediate access to weapons, that officer may justifiably seize and search the suspect and the passenger compartment of the suspect's vehicle. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). "'[T]he issue is whether a

reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.*, 463 U.S. at 1050 (quoting *Terry*, 392 U.S. at 27).

The Government argues that Officer Saylor had reasonable cause to fear for his safety based on several articulable facts. First, Saylor knew firearms were present in the vehicle based on his earlier observations of two semi-automatic rifles within reach of Cooley. Second, Cooley failed to comply with Saylor's request to immediately retrieve his identification and continued to reach down towards his lap to an area Saylor could not see due to the vehicle's height and lack of light. Third, Saylor observed a shift in Cooley's demeanor when Cooley's breathing became shallow, and he began staring straight ahead. Saylor recognized this behavior as something called a "thousand-yard stare" from his law enforcement training and knew it was a possible indicator of pre-assault behavior. Based on these facts, the Government asserts Officer Saylor reasonably feared that Cooley posed a danger and that Officer Saylor acted appropriately in seizing and searching Cooley. Cooley did not respond to this argument.

Also, of particular importance to the Court, and most likely to Officer Saylor, is the fact that Officer Saylor was unable to reach dispatch on his portable unit to run Cooley's identification due to the poor reception in the area.    Officer

13

Saylor therefore needed to return to his patrol car to use the unit therein, which had much better reception, to run Cooley's identification. Returning to his patrol car would result in leaving Cooley alone in the vehicle with the rifles.

The Court agrees with the Government's argument and finds that Officer Saylor had a reasonable belief that Cooley posed a danger when the officer drew his weapon and seized Cooley. The totality of the circumstances included that Officer Saylor was conducting a roadside investigation alone, in the middle of the night, in an unpopulated area. Officer Saylor knew weapons were present in the vehicle and, while Saylor's initial observation of the firearms did not register as alarming to him, that knowledge became alarming when combined with subsequent observations of Cooley's behavior. Thus, Officer Saylor legally seized Cooley, placed him in the patrol unit to further mitigate any risk of danger due to Saylor conducting the stop alone, and conducted a *Terry* search of Cooley and the passenger compartment of the vehicle. During this search, Officer Saylor observed a glass pipe and a plastic bag containing a white substance later positively identified as methamphetamine. Because Officer Saylor had sufficient grounds to conduct the *Terry* search, the contraband discovered need not be suppressed. *Michigan*, 463 U.S. at 1050 ("If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other

than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."). The evidence Officer Saylor discovered during the vehicle search established probable cause of violations of federal and state law for an arrest.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Defendant's Motion to Suppress (Doc. 33) is **DENIED**.

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 7th day of January, 2022.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge